Vern L. WELLS, et al., Plaintiffs,

v.

HOLIDAY INNS, INC., Defendant.

No. 77–0426–CV–W–6.

United States District Court,
W. D. Missouri, W. D.

Sept. 14, 1981.

Gregory Perlstein and Miles S. Corson, Swanson, Midgley, Gangwere, Clark & Kitchin, Kansas City, Mo., for plaintiffs.

Kent E. Whittaker and William D. Calkins, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

SACHS, District Judge.

This case arose out of the events which occurred when the individual plaintiffs, Vernon Lee Wells and Robert K. Hughes, traveled to San Francisco, California in July of 1976 for a convention of the National Office Machine Dealers Association (NOMDA). At that time, Wells owned 51% and Hughes 29% of the stock of the corporate plaintiff, Central Office Machines. Wells planned the trip as both a business undertaking relating to the convention and as a vacation, taking his wife and son with him. The Wells family, Hughes and another coowner of the corporation had reservations at defendant's Union Square Holiday Inn for three nights commencing July 15, 1976. Defendant's Proposed Finding of Fact No. 7.[1]

The reservations were made through the NOMDA travel coordinator in Bridgeport, Connecticut, to whom the check to cover the entire travel package cost was sent, and the NOMDA Housing Bureau in San Francisco. See Plaintiffs' Exhs. 3, 14, 15, 20 and 22. Although the check to cover costs included the hotel, reservation confirmation slips sent to plaintiffs by the Housing Bureau, Plaintiffs' Exhs. 8–11, indicated that no deposit had been received and that the confirmation would not be held after 6:00 p.m. unless the hotel is notified of late arrival. The Holiday Inn also sent its own confirmation slip to plaintiffs, e. g., Plaintiff's Exh. 7, which did not specifically indicate whether a deposit had been received but did state that these were "6 p. m. only" reservations. .

On July 15, 1976, after a flight delay of approximately an hour, the plaintiffs' party arrived in the lobby of the Union Square Holiday Inn at around 3:00 in the afternoon to find a crowd waiting to check into the hotel. After a considerable wait, and inquiries with various hotel personnel, plaintiffs were informed that no rooms were available for that night and that arrange-

---

1. The proposed findings which will be cited within this opinion were submitted by defendant but are among those with which plaintiffs agreed on the record and thereafter treated as stipulated. (Hereinafter referred to as "Finding No. 7")

ments would be made with another hotel for one night. They were referred to the Jack Tarr Hotel, and vouchers for taxi fares to the Jack Tarr and for the return trip to the Holiday Inn were provided. Defendant's Exhs. 102, 103. Plaintiff Hughes used the vouchers but plaintiff Wells did not. Finding No. 16. Hughes returned and stayed at the Holiday Inn on July 16; Wells did not, but remained at the Jack Tarr that night and moved to the Hyatt Regency for the night of July 17, 1976. Findings Nos. 19, 22.

The Inn Operations Manual of defendant, Defendant's Exh. 153, contains provisions for procedures for defendant's personnel to follow in the event reservations are dishonored. These include arranging substitute accommodations and paying the difference in cost if that of the substitute is higher, providing taxi fare, and other incidental expenses necessitated by the change, "such as the cost of telephone calls to notify the family of a change." Such procedures appear to have been followed in plaintiffs' case. Plaintiffs received a refund of all payment made to the NOMDA convention group which was to have been applied to lodging at Holiday Inn for the nights when it was not actually used, a total of $268.40. Plaintiffs' Exh. 17. Because Hughes and the other business associate went to Las Vegas for the last scheduled night of the San Francisco trip, plaintiffs paid, overall, $41.95 less than the amount which had been anticipated by them as payment for lodging prior to the trip. Findings Nos. 29, 30, and 31. Plaintiff Wells was required to pay $16.00 for parking when he removed his rental car from the Holiday Inn garage which he would not have been charged had he been registered at the Holiday Inn, Plaintiffs' Exh. 12, and testimony indicated that some taxi fares expended would not have been necessary if the plaintiffs had stayed at Holiday Inn.[2]

Plaintiffs contend that the dishonoring of the reservations by Holiday Inn gives rise to a claim for fraud or misrepresentation and for breach of contract. They seek actual damages in very substantial amounts, asserting (1) business losses from failure to acquire equipment at the convention for which they had a ready market, and, as to Wells (2) the triggering of a series of excruciating cluster headaches which continued for approximately two months. Punitive damages are sought under the fraud claim. This Memorandum Opinion and Order constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Rejection of the fraud claim carries with it a rejection of all but nominal claims, in that no punitive damages can be granted under the circumstances, and the measure of damages for breach of contract excludes the types of special damages here claimed. The damages were outside the reasonable mutual contemplation of the parties at the time room reservations were made. It is further concluded that plaintiffs have failed to establish, by a preponderance of the evidence, that the damages claimed were caused by the action of Holiday Inn in failing to provide the accommodation.

In Missouri, each of nine elements must be established to recover on a claim of fraud. *Cantrell v. Superior Loan Co.*, 603 S.W.2d 627, 634 (Mo.App.1980); *Hunter v. Roberts*, 267 S.W.2d 368 (Mo.App.1954). Here, plaintiffs argue that the reservation confirmation slip was fraudulent because it did not disclose the possibility that the contract might not be performed. Although the promise was not performed (resulting in a breach of the contract), there is no indication that defendant did not intend to perform it at the time it was made. The misrepresentation must be of an existing fact, rather than a contingency which could possibly occur to prevent fulfillment of the promise. See *McGuire v. Bode*, 607 S.W.2d 165, 168 (Mo.App.1980); *Dillard v. Earnhart*, 457 S.W.2d 666, 670–71 (Mo.1970); *Sun 'N Sand, Inc. v. United California*

---

**2.** The additional fares total $22.00 as to Wells—three $4.00 trips to the Union Square area and two $5.00 trips to and from the Hyatt Regency—and $4.00 as to Hughes for a trip to Chinatown (within walking distance of the Holiday Inn).

*Bank*, 21 Cal.3d 671, 148 Cal.Rptr. 329, 350–51, 582 P.2d 920, 941–42 (1978).

Absent a showing that defendant knowingly or willfully misrepresented a material fact to plaintiffs or intended not to reserve a room, there is no fraud. The failure to perform a contract cannot be transmuted into fraud or misrepresentation absent that intent. Although there may be a duty to disclose *material* facts, concealment of a remote possibility of nonperformance does not seem to be considered deceitful at common law. *See generally, McMahon v. Meredith Corp.*, 595 F.2d 433, 439 (8th Cir. 1979); *Daffin v. Daffin*, 567 S.W.2d 672, 677 (Mo.App.1978); *Goodman v. Kennedy*, 18 Cal.3d 335, 134 Cal.Rptr. 375, 383, 556 P.2d 737, 745 (1976); *Warner Construction Corp. v. City of Los Angeles*, 2 Cal.3d 285, 85 Cal.Rptr. 444, 449, 466 P.2d 996, 1001 (1970).

A promissory statement may of course be deceitful if the promisor actually had no intention of performing. *Dillard v. Earnhart, supra.* In addition, the promisor impliedly represents that he "knows of nothing which will make the fulfillment of his prediction or promise impossible or improbable." Restatement, Torts Second, § 525, Comment f. The rule so stated appears to be widely accepted. *E.g., Day v. Avery*, 548 F.2d 1018, 1027 n. 46 (D.C.Cir. 1976); *Pybus v. Grasso*, 317 Mass. 716, 59 N.E.2d 289 (1945). But one asserting fraud has generally been put to a difficult test of showing that the promisor "knew that the possibilities (of performance) were so remote...as to render (it) almost certainly unable to perform its obligations." *Ackmann v. Merchants Mortgage & Trust Corp.*, 619 P.2d 501, 506 (Colo.App.1980). Even if the Court were to assume some liberalization of this rule, to protect persons subjected to major unexpected barriers to performance, the "concealment" herein does not rise to that level.

Expert testimony indicated that overbooking to some extent is a recognized and accepted practice within the hotel industry. The day that plaintiffs were refused their rooms there was a dishonor rate at that Holiday Inn of almost four percent (4%). However, the hotel's average dishonor rate was much lower, or about half the national average of one-half of one percent. Moreover, the dishonor rate is not completely attributable to the practice of overbooking, but also is affected by such unknowns as unexpected "stay-overs." Holiday Inn's practice was reasonable under the circumstances and not generally a significant factor in whether it could fulfill its promises. Compare Judge Richey's statement that an airline's "nondisclosure of its overbooking practice was misleading and created a false understanding as to the chance of being flown..." *Nader v. Allegheny Airlines, Inc.*, 445 F.Supp. 168, 174 (D.D.C.1978), rev'd on other grounds, 200 App.D.C. 167, 626 F.2d 1031 (1980). Nothing has been presented to convince the Court that the *Nader* trial court accurately applied the pertinent common law rule, or the rule which would be applied in Missouri or California to hotel overbooking. It seems more likely that the *Nader* ruling might be persuasive in a legislative or administrative context, such as the adoption of regulations by the Federal Trade Commission pursuant to its authority to prevent unfair or deceptive practices. 15 U.S.C. § 45. The evidence before the Court indicates that the FTC has considered but has not been persuaded to adopt such regulations dealing with hotel and motel overbooking, or requiring notice to the public of such a practice.

The fraud claim is also deficient in that failure to disclose a slight chance of dishonor cannot be said realistically to have caused or prevented any conduct in reliance upon a misapprehension. It cannot be supposed that the trip would have been cancelled or that plaintiffs would have done more than was done to assure that the reservations would be honored.[3] The fail-

---

**3.** An attempt was made by plaintiffs to prepay their reservations, but through some confusion not attributable to defendant, the correct payment was not received until too late. While this makes the plaintiffs' case somewhat more appealing, it does not alter the legal rights of

ure to disclose the practice on the confirmation slip cannot be reasonably said to be material to one's decision to make or not make reservations at a hotel. However persuasive an argument of being misled by nondisclosure of such small possibilities might be in a detailed contract, or even a document as elaborate as an airline ticket, the confirmation slip used by Holiday Inns was extremely cryptic, containing a shorthand message, and there can be no valid legal criticism directed toward Holiday Inns on that score. The gist of the message was simply that Holiday Inns had received the request for the room and intended contractually to provide hotel space on that night, and the message was accurate.

Further, the television commercials aired by defendant, which plaintiffs testified they viewed and took into account before making the reservations, add nothing to the claim for fraud or misrepresentation. The most pertinent commercial, on the general theme "The Best Surprise Is No Surprise" depicts a traveler being rejected at the front desk of another hotel or motel by a desk clerk who denies receipt of a reservation. The message most obviously derived from the scene is that Holiday Inns are comparatively reliable in their reservation practices. There is no evidence in this case to the contrary. The reservation system described by the witnesses, particularly the "Holidex", appears to be generally efficient. The overbooking practice of Holiday Inns is fairly conservative compared with the general industry, and any slight exaggeration of the extent of reliability contained in the commercial falls within the category of mere "puffing" which is not actionable. See Restatement, Torts Second, § 530(1), Comment a; *Hauter v. Zogarts*, 14 Cal.3d

104, 120 Cal.Rptr. 681, 685, 534 P.2d 377, 381 (1975); *Schonfeld v. City of Vallejo*, 50 Cal. App.3d 401, 123 Cal.Rptr. 669 (1975); *McAlpine Co. v. Graham*, 320 S.W.2d 951, 955 (Mo.App.1959).

▮ Holiday Inns offered space to the Wells party, provided they appeared at the hotel before 6:00 p.m., July 15, 1976. Plaintiffs met the condition, and were legally entitled to performance of the promise. There was a breach of contract which was not waived, compromised or settled. The rulings in *Wasserman v. TWA*, 486 F.Supp. 194 (W.D.Mo.1080), aff'd 632 F.2d 69 (8th Cir. 1980), and *Christenson v. Northwest Airlines*, 633 F.2d 529 (9th Cir. 1980), are inapposite in that preclusion of recovery in those cases was based on a federal regulation barring recovery if alternative transportation is accepted. There is no comparable regulation applicable to the hotel industry, and the Court finds the existence of the regulation as to airlines insufficient to bar recovery in the instant case. Additionally, there was no "impossibility" preventing performance for several reasons; among others, there apparently were available rooms when plaintiffs reached the reservation desk, but those rooms were held for guests with guaranteed or prepaid reservations.

▮ As a general rule, the measure of damages for breach of contract is that "compensation should be equal to the injuries subject to the condition that the damages be confined to those naturally and proximately resulting from the breach and be not uncertain or speculative." *Lamb v. Amalgamated Labor Life Ins.*, 602 F.2d 155, 159 (8th Cir. 1979), quoting *Mayfield v. George O. Richardson Mach. Co.*, 208 Mo. App. 206, 231 S.W. 288 (1921); see also,

the parties. A breach of contract is a breach of contract. If anything, the *legal* status of plaintiffs suffers by reason of the prepayment foulup, in that the real cause of their loss of a room was shown to be the confusion as to their status. If the list of prepaid reservations had been properly prepared and delivered to Holiday Inns in timely fashion and with appropriate payment, the rooms would probably have been supplied. It may be noted on the other hand that the reservation manager was less than

skillful in her handling of the affair, as it seems likely she had a list of purportedly prepaid guests, which, if compared with her reservation records, would have shown that the Wells party was probably entitled to rooms, as soon as corrected checks were delivered. If her handling of matters was not commendable, it will be remembered that the day in question was a hectic one, and the lobby full of people seeking rooms.

*Boten v. Brecklein*, 452 S.W.2d 86 (Mo. 1970); *Garton v. Title Insurance & Trust Co.*, 106 Cal.App.3d 365, 165 Cal.Rptr. 449 (1980); *Seaboard Music Co. v. Germano*, 24 Cal.App.3d 618, 101 Cal.Rptr. 255 (1972). The principle established in *Hadley v. Baxendale*, 9 Ex. 341, 15 Eng.Rep. 145 (1854) limits recovery for breach of contract to those damages which could reasonably be supposed to have been within the contemplation of the parties at the time they entered into the contract. See also, *Kansas City Bridge Co. v. Kansas City Str. Steel Co.*, 317 S.W.2d 370 (Mo.1958); *Wynn v. Monterey. Club*, 111 Cal.App.3d 789, 168 Cal. Rptr. 878 (1981); *Ericson v. Playgirl, Inc.*, 73 Cal.App.3d 850, 140 Cal.Rptr. 921 (1977). The rule generally precludes such special, consequential damages as. lost profits from transactions not known to the party charged with breach, in addition to barring recovery for disappointment, mental distress, and similar claims, because such items are not normally predictable by the party breaking a contract.[4]

■ The Court is considerably persuaded by the concurring opinion of Judge Marumoto of the Hawaii Supreme Court, in comparable litigation. *Dold v. Outrigger Hotel*, 54 Haw. 18, 501 P.2d 368, 58 A.L.R.3d 360 (1972). In that case the Dold and Manthei families appealed from a denial of punitive damages in an overbooking situation in which the hotel making reservations had a practice of intentionally taking more reservations than it could accommodate, apparently for the purpose of shunting guests to a less desirable hotel, which gave the defendant hotel a "kickback" on its receipts. The Supreme Court ruled that punitive damages were not allowable, but in dicta

endorsed awards of $600 and $400 for emotional distress and disappointment. The majority announced that the awards were justified by facts which present a "fusion of the doctrines of tort and contract." Judge Marumoto concurred, concluding however that the recovery was essentially for breach of contract, disregarding possible tort claims. He noted that freedom of contract should be preserved "unclouded by uncertain legal penalties." He stated that he would affirm the award to the Dolds and the Matheis, however, by labeling the damages received by them as "compensatory" in a breach of contract case. He found it "preferable . . . to strain the traditional concept of compensatory damages (rather) than to rupture the foundations of tort and contract liability."

As a state court judge I might be strongly inclined to hold that in a certain category of breach of contract cases emotional distress in a moderate degree is a predictable result of a breach; that such distress may occur when hotel reservations are denied; but that *Hadley v. Baxendale* places a limit on anticipated mental distress at a level considerably below that which may have been suffered in this case. In view of the novelty of the issue, however, I cannot safely conclude that the Missouri Courts or the California Courts would ·probably agree with the type of award made in *Dold*, and plaintiffs have chosen the wrong forum for pioneering rulings on State law. Although tempted, I therefore deny to Mr. Wells compensation, not exceeding $500, that I believe he might be entitled to for mental distress, under a reasonable extension of the principles of *Hadley v. Baxendale*.

---

4. The distinction between damages in tort and damages in breach of contract is not a mere matter of form. Under the Holmesian theory, there is a principled difference between wrongs which may be enjoined (as by suit for specific performance) and wrongs which courts will not try to prevent. In ordinary breach of contract cases, the courts in effect give an election to the parties to perform or break a contract obligation, in accordance with their appraisal of the economic consequences. Whatever ethical implications may be involved, the party break-

ing a contract is given a legal option to perform or pay damages. A meaningful option requires that a party be able to evaluate his or her responsibilities either way. Thus, under *Hadley v. Baxendale*, one who breaks a contract is liable for only those damages which one could reasonably anticipate. While it is arguable that *Hadley* unfairly denies full compensation to an injured party, it is not this Court's role to attempt to change state law. As long as such rules are retained, they should be given principled application.

■ Eliminating mental suffering, unanticipated physical distress, and loss of business opportunities for damage considerations, the only losses within predictable normal categories, and thus recoverable, are cab fares and the garage charge previously noted. The corporate plaintiff had no contract with defendant and, of course, no damages of the type herein found recoverable. It is of interest that recovery, although quite nominal, is in the category recommended by a staff report of the FTC and by an international study to which defendant's hotel practices expert testified.

■ In the alternative, if damages beyond those allowed under the above-stated principles were to be considered, the Court finds that plaintiffs have failed in their proof of causation. Proof as to lost business opportunities is not adequate to support an assessment of damages with reasonable certainty. A claim for loss of anticipated profits of a commercial business may be "too remote, speculative and too dependent upon changes of circumstances to warrant judgment for recovery." *Coonis v. Rogers*, 429 S.W.2d 709 (Mo.1963). The Court is satisfied that a considerable amount of business is conducted at the trade show in question, and that plaintiffs had a ready market in Kansas City for various items of business equipment. However, the proof is not satisfactory as to the critical nature of the room reservation at the Holiday Inn— Union Square to acquisition of the necessary items, or that the lost room reservation seriously impeded the business activities after Thursday afternoon. Plaintiff Hughes and the third coowner lost no appreciable time in attempting to locate desirable equipment. Plaintiff Wells appears to have been more interested in litigating than in buying. He voluntarily took time off to confer with a lawyer about the prospects of litigation.[5]

Moreover, it is not shown that if Wells had spent more time looking over and pricing equipment and discussing distributorship contracts he would have been able to acquire any particular lines of equipment on acceptable terms to satisfy the potential customers in Kansas City. If his approval of a supply contract was necessary, as seems likely from his position in the company, such approval could likely have been obtained if his companions located suitable equipment on attractive terms. While he testified that he was tired and therefore slept through the business opportunity presented on Friday afternoon, his further failure to make a point of attending the session promptly on Saturday makes it impossible to conclude that but for the Thursday incident he would have clinched a deal for acquisition of the equipment.

The Court must also be skeptical of the theory that plaintiffs could not reasonably have located suitable equipment except at the convention. Trade shows are doubtless the most convenient times to negotiate sales agreements, but it is likely that any solid prospects would have been followed up before or after the convention closed, and

---

**5.** The Court cannot give credence to the theory that Wells may have been desperately seeking readmission to the Holiday Inn, and sought legal "pressure" to that end. There is no material evidence of pursuing his opportunity to return to the Holiday Inn on Friday night, and no telephone call to the inn by the lawyer or by Wells at the time of his conference with the lawyer was made. The failure to seek a room with defendant on Friday, and particularly at the time of the conference with the lawyer, may well have caused any losses which occurred after that time. There was reliable evidence from the defendant's "innkeeper" that he has no experience with people seeking rooms who fail two nights in a row. There was a probable failure to mitigate damages on the part of an angry promisee which additionally indicates it would be speculative to find the initial headache on Friday night attributable to defendant. No credibility is found to the testimony of Mr. Wells that he telephoned the hotel and was flatly refused a room on Friday morning. This would be contrary to the experience of the others in his party and to the practice stated by the innkeeper, and, in any event, the Court is not persuaded of Wells' credibility in all respects. Even in retrospect, a good deal of the testimony seemed colored by anger. While this is not unusual it does make it difficult for the Court to accept the accuracy of the witness' recollection. My reservations do not, however, apply to the basic factual contention of Wells concerning the severity of his headaches.

no showing was made why acquisitions could not be made from Kansas City after the convention, in time to satisfy the needs of the potential purchasers. The purchasers waited months and even years before buying substitute equipment. The frustrations of the trip are thus not shown to have foreclosed the market. Skepticism as to the critical nature of the NOMDA convention is increased by Wells' failure to attend the shows in 1977, 1978, or 1980.

The Court does not discount the very serious nature of Mr. Wells' problem of cluster headaches. The evidence is convincing that he suffered intermittent excruciating pain, so severe that it caused him to pace the floor at night, occasionally rolling weeping on the floor or making other attempts to block the pain, such as striking his head against the wall. Cluster headaches were shown (as the name indicates) to occur in series, the onset of which has been observed in Mr. Wells' case to be closely associated with stress, such as business pressures or overwork. The causal connection is generally broken by a remission, or temporary cessation of headaches before a new "cluster" begins. Shortly after midnight on Friday night, July 16, Wells experienced the first in what became a new cluster of headaches. Both Mr. and Mrs. Wells testified there was a brief remission ending in mid-September, 1976, prior to the onset of another series of headaches, and Mrs. Wells' diary tends to date the beginning of the remission in mid-August. The worst headaches are not shown to have occurred on any particular dates. If this case should be appealed, and a reversal should occur, the Court notes that its best valuation of the pain incurred prior to the remission would be $10,000, but concludes that this is not recoverable under present legal standards.

It is accordingly hereby

ORDERED that judgment shall be entered in favor of plaintiff Vernon L. Wells and against defendant in the amount of Thirty-eight dollars ($38.00), plus interest at the legal rate from July 15, 1976, until satisfied. It is further

ORDERED that judgment shall be entered in favor of plaintiff Robert K. Hughes and against defendant in the amount of Four dollars ($4.00) plus interest at the legal rate from July 15, 1976 until satisfied.

ORDERED that judgment shall be entered against plaintiff Central Office Machines and in favor of defendant on the claims of plaintiff Central Office Machines.

Each party to bear its own costs.